## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

=====================================

ANTHONY MAZZA                                  )
                                               )
    Plaintiff,                          )
                                               )
       v.                         )     Case No.
                                               )
CITY OF BOSTON, and                            )
FRANK J. OLBRYS,                               )
EDWARD KENNEALY,                               )
JOHN SPENCER,                                  )
JOHN T. MURRAY,                                )     **COMPLAINT**
JAMES MALAMPHY,                                )
JEROME P. MCCALLUM,                            )
GEORGE H. WHITLEY,                             )     **JURY TRIAL DEMANDED**
EDWARD SHERRY, and                             )
UNKNOWN OFFICERS OF THE                        )
BOSTON POLICE DEPARTMENT,                      )
in their individual capacities                 )
                                               )
    Defendants.                         )
                                               )

=====================================

## INTRODUCTION

1.    This is an action for money damages for the violation of the plaintiff's constitutional rights brought pursuant to 42 U.S.C. § 1983. Plaintiff Anthony Mazza alleges that the defendant police officers Frank J. Olbrys, Edward Kennealy, John Spencer, John T. Murray, James Malamphy, Jerome P. McCallum, George H. Whitley, Edward Sherry, and Unknown Officers of the Boston Police Department ("BPD") are current or former officers of the BPD who withheld exculpatory evidence and knowingly allowed at least one witness to commit perjury before the jury, in violation of the plaintiff's rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

2.    As a result of the misconduct cited above, the plaintiff was convicted of first degree murder and sentenced to life in prison without parole in May 1973. The plaintiff was released after spending almost forty-eight (48) years in prison, when the District Attorney entered a nolle prosequi on March 2, 2021.

3.   The plaintiff further alleges that the defendant City of Boston, and Boston Police Department had a policy, custom, or practice of improper and inadequate investigation and discipline of acts of misconduct committed by Boston police officers, including withholding of exculpatory evidence. The defendant police officers conspired to conceal the existence of exculpatory evidence and deny the plaintiff his right to a fair trial. The defendant City of Boston had a policy, custom, or practice of failure to train its police officers adequately in the laws regarding exculpatory evidence, perjury, and other laws, rules and regulations relating to the rights of a citizen charged with a crime. These policies, customs, or practices resulted in implicit tolerance and authorization of continuing misconduct and caused the plaintiffs improper deprivation of his constitutional rights.

## JURISDICTION AND VENUE

4.   This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation under color of law of Mr. Mazza's rights secured by the United States Constitution.

5.   This Court has jurisdiction of Mr. Mazza's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

6.   Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Mr. Mazza's claims occurred within this judicial district.

## PARTIES

7.   Plaintiff Anthony Mazza is a man who spent almost forty-eight (48 )years in prison for crimes he did not commit.

8.   Defendants Frank J. Olbrys, Edward Kennealy, John Spencer, John T. Murray, James Malamphy, Jerome P. McCallum, George H. Whitley, Edward Sherry, and Unknown Officers of the BPD are current or former officers of the BPD. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and for supervising other police officer Defendants. These Defendants committed, facilitated, and approved the constitutional violations at issue in this case.

9.   On information and belief, Defendants Frank J. Olbrys, Edward Kennealy, John Spencer, John T. Murray, James Malamphy, Jerome P. McCallum, George H. Whitley, Edward Sherry are deceased; and, on information and belief, none of said deceased defendants have an outstanding estate.

2

Further, for each, the Defendant City of Boston is obligated to "indemnify and save harmless municipal officers ... from personal financial loss and expense including reasonable legal fees and costs, if any ... arising out of any claim, demand, suit or judgment by reason of any act or omission, except an intentional violation of civil rights of any person, if the official at the time of . such act or omission was acting within the scope of his official duties or employment." Mass. Gen. Laws ch. 258, § 13. In these circumstances, service is to be made to the City of Boston. Mass. Gen. Laws ch. 190B, § 3-803(d)(2).

10.   Defendant City of Boston, Massachusetts, is a municipality of the Commonwealth of Massachusetts, which oversees the BPD. Each of the Defendants referenced above was employed by the City of Boston or was acting as an agent of the City of Boston and the BPD while conducting the investigation described in this Complaint. Defendant City of Boston is therefore liable for all civil wrongs committed by these Defendants pursuant to the doctrine of respondeat superior. Defendant City of Boston is additionally responsible for the policies and practices of the BPD, which were implemented by Defendants in this case. Finally, Defendant City of Boston is responsible at law for any judgment entered against Defendants.

11.   At all times relevant to the events described in this Complaint, each of the individual Defendants acted under color of law, within the scope of his employment, and as an investigator. Each of the individual Defendants is sued in his individual capacity, unless otherwise noted.

## STATEMENT OF FACTS

12.   Peter Armata (the "victim") was robbed and murdered on or about July 1, 1972 in the apartment of Robert Anderson ("Robert") at 384 Bowdoin Street, Dorchester, a neighborhood in the Defendant City of Boston.

13.   Robert was arrested on July 5, 1972 by Defendants, and initially charged with first degree murder and robbery.

14.   Upon arrest, Robert immediately spoke with Defendants, including amongst others, BPD Homicide Lieutenant Detectives Edward Sherry and Jerome P. McCallum, to exculpate himself and blame the Plaintiff, Anthony Mazza, for the murder and robbery of the victim.

15.   After Robert shifted the blame to Mr. Mazza, by the time of Mr. Mazza's trial, Robert faced only a pending charge of accessory after the fact to murder.

3

16.     On July 10, 1972, Robert's brother William Anderson ("William") was
        interviewed on tape by Defendants, specifically Defendant BPD homicide
        detectives, Defendants Frank J. Olbrys and Edward Kennealy.

17.     In crucial details, William's statement contradicted the story related to
        Defendants by his brother Robert, directly pointed to Robert as the actual
        perpetrator, and exculpated Mr. Mazza.

18.     Defendants knew that William's statement supported Mr. Mazza's innocence
        and pointed to Robert as the perpetrator.

19.     Defendants withheld the interview tape and the transcript from Mr. Mazza
        and his defense team.

20.     Mr. Mazza was arrested on July 6, 1972 by BPD Defendants and charged
        with the murder and robbery of the victim, based upon the statements Robert
        made thereafter to Defendants.

21.     Mr. Mazza did not commit the crimes, and there was no forensic evidence
        connecting him to the crimes.

22.     In pursuing Mr. Mazza, in suppressing evidence, and suborning false
        testimony by Robert and by Robert's brother William, Defendants were
        motivated by homophobia, based upon the perception that Mr. Mazza was
        homosexual.

23.     Knowing that they were already suppressing William's statement, which is
        described below, when investigating Mr. Mazza's alibi, instead of validating
        Mr. Mazza's innocence, Defendants, including homicide Detectives Frank J.
        Olbrys, Edward Kennealy, and George H. Whitley, gathered completely
        irrelevant information from Mr. Mazza's roommate in order to smear Mr.
        Mazza as a homosexual "queer," including:

        a.      That Mr. Mazza slept on the same mattress with another roommate, a
                man;

        b.      The other roommate was a "queer;"

        c.      The previous evening Mr. Mazza had gone to a bar, known to be "a
                queer place;"

        d.      They also interviewed Robert's girlfriend for the sole purpose of

4

establishing that the other roommate dressed in women's clothes;

    e.    Defendants provided this information to the prosecutor to use at trial to maliciously and irrelevantly attack the roommate's alibi testimony and prejudice Mr. Mazza with the jury, which was accomplished to Mr. Mazza's detriment.

24.    Mr. Mazza was wrongly convicted of the murder and robbery of the victim based on the testimony of Robert.

25.    Mr. Mazza was wrongly incarcerated for almost 48 years.  He has always maintained his innocence.

26.    As a result of Defendants' misconduct, Mr. Mazza was tried by a jury in 1973; after a one-week trial, a jury convicted Mr. Mazza of first-degree murder based on Robert's testimony,

27.    Mr. Mazza was charged, prosecuted, and wrongly convicted of murder.  He was sentenced to life in prison.

28.    Defendants' concealment of William's statement is shocking because Defendants either knew or were deliberately indifferent to the fact that Mr. Mazza was not guilty and that Robert was the most likely perpetrator of the murder of Peter Armata.  They knew this based on the evidence:

    a.    Robert was known to Defendants as a violent criminal, with many arrests, as well as prior convictions for robbery, assault and battery with a dangerous weapon, and receiving stolen goods;

    b.    Defendants knew that on the morning after the murder Robert bragged of robbing and killing the victim to Mr. Mazza's roommate, who was Robert's lifelong friend, including

        i.    describing how Robert he had lured the victim to his apartment; and

        ii.    the method Robert used to strangle the victim.

    c.    When another friend of Robert's asked why he had a body in his apartment, Robert said, "I don't know. I guess I hit him too hard;"

    d.    In his statements to the police blaming Mr. Mazza, Robert told a number of different versions of what he claimed happened,

contradicting himself repeatedly. Robert admitted to lying under oath about supposed "facts" which inculpated Mr. Mazza. Robert also admitted he did not know if he had lied or not in prior sworn testimony inculpating Mr. Mazza;

e.  On July 4, 1972, Robert was driving the victim's stolen new Pontiac Grand Prix automobile, which he used to take friends to the beach. After leaving his friend's house, Robert saw BPD officers outside looking at the victim's  Grand Prix.  Robert turned on his heels, went back into the house and out the back door to evade arrest;

f.  To place Mr. Mazza at the scene, Robert implausibly claimed Mr. Mazza had told him earlier in the evening before the murder that he needed a place to sleep;

g.  Robert and Defendants knew that in fact Mr. Mazza had his own apartment at 71 Chandler Street in the South End neighborhood of Boston, four miles from the scene of the murder;

h.  For days, Robert asked a number of people to help him dispose of the body, including William;

i.  On or about July 5, 1972, Robert's landlady asked Robert about a smell coming from the back closet.  Robert professed to not recall what he said in response, but was clear he said nothing to her about the decomposing body in his closet;

j.  A few days before being arrested, upon hearing police announce their presence at the front door of the apartment, Robert jumped from a second-floor rear window and ran to a nearby subway station to evade arrest;

k.  Robert admitted fleeing from the Defendants when they arrived, and then after being caught days later telling them Mazza did it, because by placing Mazza at the scene of the crime, he was protecting himself, and that if he testified to his version of what happened he would not be accused of murder;

l.  Inside Robert's apartment, where he lived alone, Defendants found the victim's body, bound and stuffed into a kitchen closet, as well as the victim's driver's license and bank card;

m.  By withholding William's statement, Defendants deprived Mr. Mazza

6

of crucial exculpatory evidence, as well as evidence inculpatory of Robert:

i.  In the statement withheld by Defendants, William said when Mr. Mazza was in another room, Robert asked William if he would "help him move somebody from the premises." When William declined, Robert became angry, then used a key to unlock the door to a closet, all of which William did not mention at trial;

ii.  In the statement withheld by Defendants, William related that when Robert exercised a disturbing familiarity with and control over the body when he showed it to William;

    (1)  Robert gave William a knife to cut a nylon stocking gag from the victim's mouth, but William refused and gave the knife back to Robert;

    (2)  Robert then cut the nylon from the victim's mouth and rope from the victim's wrists;

    (3)  Robert then casually cleaned the knife off and put it in his kitchen sink;

    (4)  When William continued to resist helping with the victim's body, Robert said he planned to put the body in the victim's Grand Prix automobile and dump it in the river.

    (5)  Robert did not tell William how the body came to be there.

iii.  Robert told Defendants that he asked for William's help moving the body in front of Mr. Mazza, and that Mr. Mazza offered to help instead. Defendants withheld William's statement in which he exculpated Mr. Mazza, saying the two brothers were alone when Robert requested his help moving the body;

iv.  Robert told Defendants Mr. Mazza came to his apartment in the *morning* after the murder, as did William; Robert claimed at that time, he showed the body to William with Mr. Mazza present. In William's withheld statement, Robert showed him the body in the *evening* on the day after the death;

      v.      Robert told Defendants he gave William the victim's ring the morning after the murder with Mr. Mazza present, saying "[Mazza] told me to give it to you."

      vi.     In the statement withheld by Defendants, William exculpated Mr. Mazza, telling Defendants that Robert gave William the victim's ring in the evening as a birthday present, when Mazza was not there, and Robert made no reference about Mazza as to this "gift."

      vii.    Defendants knew that Robert had sold the victim's watch the day after the murder and robbery;

      viii.   In the statement withheld by Defendants, William related to the Defendants that Robert told him that Robert had sold the victim's watch, which statement was not mentioned by William in his testimony at trial;

      ix.     William's withheld statement substantially undermined the only corroborative witness to Robert's testimony of what happened, that is, William himself, Robert's own brother;

      x.     None of the this evidence from William's withheld statement , exculpatory as to Mr. Mazza and inculpatory of Robert, surfaced at the trial;

   n.    None of the physical evidence at the crime scene suggested that Mr. Mazza had anything to do with the crime.

   o.    Defendants knew that Mr. Mazza had a verifiable alibi during the time the murder was committed, which they verified with Mr. Mazza's roommates;

29.    The Defendant BPD Police Officers were present in court throughout the trial of Mr. Mazza, including Homicide Detectives Frank J. Olbrys and Edward Kennealy, and therefore knew that the crucial evidence contained in the statement of William Anderson had been withheld from Mr. Mazza and his attorneys.

30.    Defendants knowingly covered up the withholding of William's statement, demonstrated, amongst other things by their actions and inaction:

a.  BPD Police Officers, including Detectives Frank J. Olbrys and Edward Kennealy who had taken the statement of William Anderson, were present in court throughout the trial of Mr. Mazza, including during the testimony of William Anderson and the testimony of Robert Anderson, and therefore that neither William or Robert either mentioned or were questioned about William's withheld statement;

b.  Detective Frank J. Olbrys testified for the Commonwealth at the trial. He did not mention the statement he had taken with Detective Edward Kennealy of William Anderson;

c.  Defendant BPD Homicide Police Officers were present in court throughout the trial of Mr. Mazza, including Lt. Detective Edward Sherry, Lt. Det. Jerome P. McCallum, Sgt. Det. John T. Murphy, Det. Frank J. Olbrys, Det. Edward Kennealy, Det, John Spencer, and Det. George H. Whitley knew that the crucial evidence contained in the statement of William Anderson was not elicited.

31.  After Mr. Mazza's conviction, he produced affidavits in 1978 from four prisoners attesting to statements made to them by Robert that:

a.  Defendants told him he better say it was Mazza who committed the crimes or Defendants would "put the heat" on Robert;

b.  Robert set up Mr. Mazza for the crimes, including Robert giving the victim's credit cards to Mr. Mazza and asking Mr. Mazza to use them for him;

c.  Robert knew that Mr. Mazza's intellectual capabilities were deficient, and he exploited it, specifically saying "Mazza was so stupid because he did not know how to read or write, and that Mazza wouldn't understand what was going on anyway;"

d.  Robert repeatedly said Mr. Mazza was not guilty of the charges that Robert testified to;

e.  Robert lied on the stand at trial;

f.  Mr. Mazza was not guilty of the crimes;

g.  William also knew Mr. Mazza was not the killer and knew Robert was lying on the stand.

32. Defendants did not investigate these additional confessions made by Robert.

33. Mr. Mazza only found out about William's withheld statement after a hard and long legal battle with Defendants.  Sometime in the 1990s, after he learned that he should have received witness statements from the police, Mr. Mazza embarked on a close to ten-year effort to obtain the relevant documents.  In 2005, Mr. Mazza finally received William's statement that had been withheld by Defendants.

34. Forty-eight years after he was wrongly arrested for the murder and robbery of Mr. Armata, the Supreme Judicial Court of the Commonwealth of Massachusetts granted Mr. Mazza a new trial based on the Defendants having withheld William's statement from Mr. Mazza and his defense team.

35. On March 2, 2021 the prosecution dismissed both charges against Mr. Mazza, ending an almost 49 year long nightmare.

36. On September 29, 2023, the Superior Court for Suffolk County entered an order expunging the record of Mr. Mazza's convictions in this case.

37. Mr. Mazza walked out of prison a free man, having served two-thirds of his life behind bars for crimes he did not commit.

38. Mr. Mazza now seeks justice for the harm that Defendants have caused and redress for the loss of liberty and the terrible hardship that he endured and continues to suffer as a result of Defendants' misconduct.

39. As a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Mr. Mazza suffered injuries and damages, including: physical pain and suffering, personal injuries, infliction of physical illness and inadequate medical care, for which he is entitled to monetary relief;

40. All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

41. Without Defendants' misconduct, Mr. Mazza never would have stood trial and never would have been convicted of the murder of Peter Armata. Without Robert's false evidence, there was nothing to support a criminal proceeding against Mr. Mazza.

42.   Mr. Mazza was in his early twenties, in the prime of his life, when he was wrongly convicted.  Mr. Mazza's whole life was turned upside down without any justification.

43.   Mr. Mazza was taken away from his mother, siblings, other relatives, and friends. Because of Defendants' misconduct, Mr. Mazza has missed out on the lives of his family and friends.

44.   While Mr. Mazza was wrongly imprisoned, except for his sister, he lost his entire family – his mother and father, brother, grandfather and uncle all died.  He missed the opportunity to have and raise children.

45.   Mr. Mazza was deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Mr. Mazza has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

46.   During his decades of wrongful imprisonment, Mr. Mazza was detained in harsh and dangerous conditions in Massachusetts prisons.

47.   In addition to the severe trauma of wrongful imprisonment and Mr. Mazza's loss of liberty, Defendants' misconduct continues to cause Mr. Mazza extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

## COUNT I

**Deliberately Suppressing Material Evidence
42 U.S.C. § 1983 and the 4ᵗʰ and 14ᵗʰ Amendments – Due Process**

48.   Mr. Mazza incorporates each paragraph of this Complaint as if fully restated here.

49.   In the manner described more fully above, Defendants, while acting as investigators and police offices, individually, jointly, and in concert with one another, as well as under color of law and within the scope of their employment, deprived Mr. Mazza of his constitutional right to a fair trial secured under the Fourth and Fourteenth Amendments of the United States Constitution.

50.   Defendants deliberately withheld exculpatory evidence from Mr. Mazza and

11

from state prosecutors, Mr. Mazza, and his lawyers, among others, thereby misleading and misdirecting the criminal prosecution of Mr. Mazza.

51.    By withholding William's statement, Defendants solicited false evidence, including testimony that they knew to be false, implicating Mr. Mazza in the crime, obtained Mr. Mazza's conviction using that false evidence, and failed to correct evidence that they knew to be false when it was used against Mr. Mazza at his criminal trial.

52.    In addition, Defendants concealed and fabricated additional evidence that is not yet known to Mr. Mazza.

53.    Defendants who were supervisors charged with overseeing the investigation of the victim's murder and the other individual Defendants knew full well of this misconduct, the suppression of exculpatory evidence, and the resultant fabrication of a false case against Mr. Mazza. These supervisors nevertheless intentionally ignored Defendants' misconduct, and decided to make Mr. Mazza responsible for a crime he did not commit, rather than directing the officers to find the person who had killed Mr. Armata, presumably Robert.

54.    Defendants' misconduct directly resulted in the unjust criminal conviction of Mr. Mazza, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mr. Mazza could not and would not have been pursued.

55.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Mazza's innocence.

56.    As a result of Defendants' misconduct described in this Count, Mr. Mazza suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

57.    Mr. Mazza's injuries were caused by the official policies of Defendant City of Boston and the BPD, by the practices and customs of Defendant City of Boston and the BPD, as well as by the actions of final policymaking officials for Defendant City of Boston and the BPD.

58.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston promulgated rules, regulations, policies, and procedures governing witness interviews, photo

lineups, live lineups, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of employees and agents of the City of Boston, including employees and agents of the BPD.

59. These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Boston, including the individual Defendants, who were responsible for conducting investigations of crimes in and around Boston, Massachusetts.

60. BPD leadership did not adequately train or supervise the Defendant Homicide detectives on investigative conduct, including their disclosure obligations to the prosecution and, by extension, to defense counsel.

61. BPD also had a custom and practice of withholding exculpatory evidence, including in particular evidence maintained in Detectives' separate files, whether paper "desk files" or files kept electronically. Despite awareness of this ongoing issue, the BPD permitted this widespread failure to disclose to persist for decades.

62. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Mr. Mazza, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence or highly suspect to suggest that they were involved.

63. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

64. The above-described widespread practices, which were so well settled as to constitute the de facto policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

65.     The misconduct described in this Count was undertaken pursuant to the
        policy and practices of Defendant City of Boston in that the constitutional
        violations committed against Mr. Mazza were committed with the knowledge
        or approval of persons with final policymaking authority for the City of
        Boston and the BPD, or were actually committed by persons with such final
        policymaking authority.

66.     The policies, practices, and customs set forth above were the moving force
        behind the constitutional violations in this case and directly and proximately
        caused Mr. Mazza to suffer the grievous and permanent injuries and
        damages set forth above.

67.     Mr. Mazza's injuries were caused by officers, agents, and employees of the
        City of Boston and the BPD, including but not limited to the individually
        named Defendants, who acted pursuant to the policies, practices, and
        customs set forth above in engaging in the misconduct described in this
        Count.

## COUNT II

**42 U.S.C. § 1983 and the 4th and 14th Amendments – Malicious Prosecution**

68.     Mr. Mazza incorporates each paragraph of this Complaint as if fully restated
        here.

69.     Defendants, acting individually and in concert, intentionally withheld from
        and misrepresented to prosecutors and the grand jury exculpatory facts that
        vitiated probable cause against Mr. Mazza and would have severely
        impeached the only witness who implicated Mr. Mazza for the prosecution at
        trial.  These Defendants also failed to conduct a constitutionally-adequate
        investigation in light of evidence pointing to other suspects and away from
        Mr. Mazza.

70.     In the manner described above, Defendants, acting as investigators,
        individually, jointly, and in conspiracy with one another, as well as under
        color of law and within the scope of their employment, accused Mr. Mazza of
        criminal activity and exerted influence to initiate, continue, and perpetuate
        judicial proceedings against Mr. Mazza without probable cause for doing so
        and in spite of the fact that they knew Mr. Mazza was innocent.

71.     In doing so, Defendants caused Mr. Mazza to be unreasonably seized without
        probable cause and deprived of his liberty, in violation of Mr. Mazza's rights

14

secured by the Fourth and Fourteenth Amendments.

72. The false judicial proceedings against Mr. Mazza were instituted and continued maliciously, resulting in injury.

73. Defendants deprived Mr. Mazza of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty, and Massachusetts law does not provide an adequate state-law tort remedy to redress that harm.

74. In addition, Defendants subjected Mr. Mazza to arbitrary governmental action that shocks the conscience in that Mr. Mazza was deliberately and intentionally framed for a crime of which he was innocent, through Defendants' fabrication and suppression of evidence.

75. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Mazza's clear innocence.

76. Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Mazza's clearly established constitutional rights.

77. No reasonable officer at any point from 1972 to 2020 would have believed this conduct was lawful.

78. Mr. Mazza is completely innocent of the murder and robbery of Mr. Armata, The prosecution terminated in his favor when the judgment of conviction and sentence were vacated and dismissed.

79. As a direct and proximate result of Defendants' actions, Mr. Mazza was wrongly convicted and imprisoned for nearly forty-eight years and suffered the other grievous and continuing damages and injuries set forth above.

80. As a result of Defendants' misconduct described in this Count, Mr. Mazza suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

81. On March 2, 2021, the judicial proceedings against Mr. Mazza were terminated in his favor, in a manner indicative of his innocence, when the Commonwealth of Massachusetts entered a nolle prosequi.

15

82. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Boston, and by Defendants who were final policymakers for Defendant City of Boston, in the manner more fully described above.

## COUNT III

### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

83. Mr. Mazza incorporates each paragraph of this Complaint as if fully restated here.

84. After the murder of Peter Armata, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. Mazza for the murder of Peter Armata, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

85. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Mazza of these rights.

86. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity, including:

   a. Concealing exculpatory evidence that tended to show Mr. Mazza's innocence;

   b. Suborning false or highly misleading testimony;

   c. Deliberately and recklessly failing to investigate leads pointing to other suspects and corroborating Mr. Mazza's innocence; and

   d. Engaging in deliberate deception by deliberating suppressing evidence during the pendency of the case in violation of *Mooney v. Holohan*, 294 U.S. 103 (1935).

87. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Mazza's innocence.

16

88. As a result of Defendants' misconduct described in this Count, Mr. Mazza suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

89. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Boston, and by Defendants who were final policymakers for Defendant City of Boston, in the manner more fully described above.

## COUNT IV

### 42 U.S.C. § 1983 – Failure to Intervene

90. Mr. Mazza incorporates each paragraph of this Complaint as if fully restated here.

91. In the manner described above, during the constitutional violations described herein, one or more of Defendants stood by without intervening to prevent the violation of Mr. Mazza's constitutional rights, even though they had the opportunity to do so.

92. As a result of Defendants' failure to intervene to prevent the violation of Mr. Mazza's constitutional rights, Mr. Mazza suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

93. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Mr. Mazza's innocence.

94. As a result of Defendants' misconduct described in this Count, Mr. Mazza suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

95. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Boston, and by Defendant who were final policymakers for Defendant City of Boston, in the manner more fully described above.

## COUNT V

### 42 U.S.C. § 1983 – Supervisory Liability

96.   Mr. Mazza incorporates each paragraph of this Complaint as if fully restated here.

97.   Mr. Mazza's continued wrongful detention was caused by the deliberate indifference and recklessness of supervisors, who included, amongst others, Defendant Homicide Lieutenant Detectives Edward Sherry and Jerome P. McCallum as well as Defendant Sergeant Detective John T. Murray, when they failed to adequately supervise, discipline, and train the individual BPD Defendants, including Homicide Detectives Olbrys, Kennealy, Spencer, and Whitley, as well as BPD Officers, including James Malamphy, as well as other officers.

98.   The BPD supervisors were personally involved in the case against Mr. Mazza and knew or, in the absence of deliberate indifference and recklessness, should have known of the subordinates' unconstitutional actions and related misconduct in the case.

99.   Furthermore, the supervisors failed to supervise the BPD Defendants in constitutionally adequate law enforcement practices, particularly those concerning interviews of suspects, promises, rewards and inducements given 18to witnesses, and the production of exculpatory evidence, thereby encouraging and/or permitting these employees to engage in a reckless investigation, to fabricate false inculpatory evidence, and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Mazza.

100.  These interview techniques, failures in producing exculpatory evidence, fabrications, and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that the supervisors failed to train and supervise subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Mazza's constitutional rights.

101.  Mr. Mazza is completely innocent of the murder and robbery of Mr. Armata. The prosecution terminated in his favor when the judgment of conviction and sentence were vacated and dismissed.

102.  As a direct and proximate result of Defendants' actions, Mr. Mazza was wrongly convicted and imprisoned for nearly forty-eight years and suffered

the other grievous and continuing damages and injuries set forth above.

## COUNT VI

### 42 U.S.C. § 1983 – Monell Claim

103. Mr. Mazza incorporates each paragraph of this Complaint as if fully restated here.

104. Mr. Mazza's injuries were caused by the official policies of Defendant City of Boston and the BPD, by the practices and customs of Defendant City of Boston and the BPD, as well as by the actions of final policymaking officials for Defendant City of Boston and the BPD.

105. At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston promulgated rules, regulations, policies, and procedures governing witness interviews and preparation and presentation of witness testimony, as well as disclosure of investigative materials and evidence.

106. Defendant City of Boston was also responsible for the supervision, training, and discipline of employees and agents of the City of Boston, including employees and agents of the BPD.

107. These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Boston, including the individual Defendants, who were responsible for conducting investigations of crimes in and around Boston, Massachusetts.

108. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Mr. Mazza, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

109. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately supervise, train, and discipline

19

their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

110. The above-described widespread practices, which were so well settled as to constitute the de facto policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

111. Mr. Mazza's injuries were caused by officers, agents, and employees of the City of Boston and the BPD, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

WHEREFORE, Plaintiff Anthony Mazza respectfully requests that this Court enter a judgment in his favor jointly and severally against Defendants as follows:

a. That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

b. That the Court award punitive damages to him, and against Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims;

d. For any and all other relief to which he may be entitled and this court deems mete and just.

## JURY DEMAND

Plaintiff Anthony Mazza demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

ANTHONY MAZZA,
By his attorneys

John H. Cunha, Jr.

20

cunha@cunhaholcomb.com
B.B.O. No. 108580
Helen Holcomb
holcomb@cunhaholcomb.com
B.B.O. No. 547538
Charles Allan Hope
hope@cunhaholcomb.com
B.B.O. No. 634731
CUNHA & HOLCOMB, P.C.
I State Street, Suite 500
Boston, MA 02109-3507
(617) 523-4300