UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY MAZZA | ) |
| | ) |
| v. | ) Case 1:24-cv-10333-NMG |
| | ) |
| CITY OF BOSTON, et alia | ) |
| | ) |

### PLAINTIFF'S MOTION TO RECONSIDER

Plaintiff, Anthony Mazza, moves for reconsideration of this Court's Memorandum and Order (Docket No. 23) ("the Order"), dated October 15, 2024, which:

1) dismissed portions of his Complaint;[1]

2) denied his motion to compel defendant City of Boston to accept service[2] for the individual defendants herein (Docket No. 13); and

---

[1] Plaintiff does not seek reconsideration of so much of the Order as dismissed Count Five of the Complaint.

[2] The question raised by this motion is not if the City will eventually indemnify the deceased defendants, which is not yet ripe for determination by the City or the Court. Rather, it is whether, as to each deceased officer, plaintiff may serve the summons and Complaint upon the City, and whether the City is obligated to accept service for the officers. Serving a municipality is not an extraordinary remedy. Massachusetts law already has a mechanism to serve public employers. *See* M.G.L. c. 258 § 6 ("The public attorney shall defend all civil actions brought against a public employer or public employee of the commonwealth pursuant to this chapter. Service of process for such civil action shall be made upon the public attorney or, where no such public attorney has been employed for such purpose at the time service is made, service shall be made upon the executive officer of such public employer."). In this case, plaintiff sent the summons and copy of the Complaint for each deceased defendant to the "public attorney," the City's counsel, which refused to accept service.

3) denied his motion for extension of time to complete service on the individual defendants (Docket No. 22).[3]

In the alternative, plaintiff asks that an order issue that the Order "involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the [O]rder may materially advance the ultimate termination of the litigation," such that plaintiff may pursue an interlocutory appeal of the issues presented. 28 U.S.C. § 1292(b).

## BACKGROUND

The facts set out herein are taken from the Complaint, which must be treated as true in deciding a Motion to Dismiss. *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) ("[w]e accept as true the complaint's well-pleaded factual allegations and draw all reasonable inference in favor of the non-moving party" (*internal quotations omitted*)).[4]

This is an action brought against the City, and against police officers employed by the City at the time of the relevant incidents herein, for violation of Mr. Mazza's rights by purposefully hiding evidence and knowingly allowing perjury in order to secure his conviction on charges of murder and robbery. Complaint, ¶1. The individual defendants, acting under color of law, were investigating officers and/or supervisory officers. Complaint, ¶¶ 8, 16. Since the Motion to Dismiss sought only to dismiss the claims against the City, not the individual defendants,

---

[3] Plaintiff incorporates Docket No. 13 and Docket No. 22 herein by reference.

[4] Citations to the Complaint are by paragraph, as numbered therein.

the actions of the individual defendants are not relevant to the Order. The unconstitutional actions of the individual defendants are set out in detail in the Complaint.

On or about July 1, 1972, Peter Armata ("the victim") was robbed and murdered in the apartment of Robert Anderson ("Robert") at 384 Bowdoin Street in Dorchester, a neighborhood of Boston. On July 5, 1972, Robert was arrested and charged with first-degree murder and robbery. Complaint, ¶¶12-13.

During the course of the Boston Police Department ("BPD") investigation, the evidence was clear that Robert was the most likely killer. The defendants were aware that Robert was a violent criminal with many arrests and a history of prior convictions, including convictions for robbery and assault and battery. They knew he had confessed twice to the Armata murder, describing the way he strangled the victim to one witness and responding to another witness who asked why there was a body in his apartment by explaining "I don't know. I guess I hit him too hard." They knew he was driving the victim's stolen car after the murder, and on July 4, 1972, when they located the car, Robert deliberately avoided police officers in an attempt to evade arrest. On another occasion, he jumped from the second story rear window of his apartment to avoid police officers at the front door. The victim's body, bound and stuffed into a kitchen closet, stayed in Robert's apartment, where he lived alone, for days after the murder. Robert asked multiple people for assistance in trying to dispose of the body. Mr. Mazza's roommates provided him with an alibi during the time the crime was committed. Complaint, ¶28(a)-(o).

3

Nonetheless, after his arrest, Robert gave statements to multiple individual BPD defendants, seeking to exculpate himself and place the blame for the crimes on Mr. Mazza. Complaint, ¶¶123, 140. Robert's statements were contradicted in multiple material and relevant ways by the taped statement the BPD defendants secured from his brother, William Anderson ("William") on July 10, 1972, which pointed to Robert as the actual killer, not Mr. Mazza. Complaint, ¶¶16-17. William's statement included, *inter alia*:

- the fact that Robert alone asked William to help dispose of the body, contradicting Robert's allegation that Mr. Mazza was also present;
- the fact that Robert told William he was going to dump the body in the river, which Robert never told anyone else and did not so testify;
- the fact that Robert alone gave the victim's ring to William as a birthday gift with no mention of it coming from Mr. Mazza, in contradiction to Robert's allegation that the ring was given to William in Mr. Mazza's presence and with a statement that it was "from" Mr. Mazza; and
- the fact that Robert told William he had sold the victim's watch.

Complaint, ¶¶16, 28.[5] There was no forensic evidence against Mr. Mazza. In fact, Robert's testimony was the only direct evidence against Mr. Mazza, and without Robert's testimony, there was no case against Mr. Mazza. Complaint, ¶¶21,24,26.

---

[5] *See also Commonwealth v. Mazza*, 484 Mass. 539 (2020), reversing Mr. Mazza's conviction.

4

The defendants, knowing William's statement inculpated Robert and was exculpatory of Mr. Mazza, deliberately concealed the statement, failing to provide it to the District Attorney's office or to defense counsel. Complaint, ¶¶17-19, 230. None of the facts in the withheld statement, unknown to defense counsel, were mentioned by William in his testimony at trial. Multiple individual BPD defendants herein, who were aware of these facts from William's withheld statement, were present for the trial and did not bring these facts to light. Complaint, ¶¶29-30.

The Complaint makes clear that the individual BPD defendants' concealment of exculpatory evidence and failure to correct Robert's perjured testimony followed the policies and the pattern, policy and practice of the BPD and the defendant City of Boston in 1972. Complaint, ¶¶30,33,39-40,57-67,82,89,95,103-111.

The defendants' decision to charge Mr. Mazza rather than Robert for the crime was based on their determination that Mr. Mazza was a "queer." They arrested Mr. Mazza on July 6, 1972 and charged him with murder and robbery of the victim. They developed, and presented at trial, evidence that Mr. Mazza shared a mattress with one of his roommates, a "queer" man who sometimes dressed in women's clothes. They presented evidence to the jury that Mr. Mazza had gone to a bar that was known as "a queer place" the night before the murder. They presented this evidence at trial to prejudice the jury against Mr. Mazza and maliciously and irrelevantly attack his alibi witnesses. Complaint, ¶¶22-23. *See also Commonwealth v. Mazza*, 484 Mass. 539, 544 n.11 (2020).

5

Mr. Mazza was wrongly convicted of murder in May 1973. He maintained his innocence throughout the trial and to this day. Complaint, ¶¶7,21,24-27. The defendants' malicious failure to pursue the real killer, Robert, and to continue concealing William's exculpatory statement, continued for at least another three decades. In 1978, Mr. Mazza produced affidavits from four witnesses stating that Robert had confessed to each of them separately in jail that he deliberately framed Mr. Mazza for the crime. Defendants did nothing to further investigate or revisit the case based on these confessions. Complaint, ¶¶31-32. In the mid-1990s, Mr. Mazza learned that he should have been provided with all the witness statements. He undertook a nearly ten year legal battle with the defendants, including the City, to avoid producing William's statement. He did not receive William's withheld statement until 2005. Complaint, ¶33.

Subsequent to receiving William's statement, Mr. Mazza sought relief from the Massachusetts state courts. His conviction was overturned by the Supreme Judicial Court 48 years after his initial wrongful arrest. Complaint, ¶¶2,7,25,79, 102; *Mazza*, 484 Mass. at 540, 551. On March 2, 2021, the prosecution dismissed the charges against Mr. Mazza, and on September 29, 2023, the Suffolk Superior Court entered an order expunging the convictions. Complaint, ¶¶34-36,101.

## I. THE ORDER'S DISMISSAL OF SO MUCH OF THE COMPLAINT AS ALLEGES A FAILURE TO TRAIN MUST BE RECONSIDERED AND REVERSED

The Order states that so much of plaintiff's complaint as alleges a failure to train is dismissed because "his complaint fails to allege that his harm is related in

6

any way to a history of recurring rights violations, nor does he claim another instance of an unconstitutional withholding of evidence or improper interview that would constitution [sic] a *Monell* violation." Order, p. 12. Specifically to the contrary, the Complaint alleges that:

61. BPD also had a custom and practice of withholding exculpatory evidence, including in particular evidence maintained in Detectives' separate files, whether paper "desk files" or files kept electronically. Despite awareness of this ongoing issue, the BPD permitted this widespread failure to disclose to persist for decades.

62. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Mr. Mazza, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence or highly suspect to suggest that they were involved.

63. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

64. The above-described widespread practices, which were so well settled as to constitute the de facto policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

65. The misconduct described in this Count was undertaken pursuant to the policy and practices of Defendant City of Boston in that the constitutional violations committed against Mr. Mazza were committed with the knowledge or approval of persons with final policymaking authority for the City of Boston and the BPD, or were actually committed by persons with such final policymaking authority.

66. The policies, practices, and customs set forth above were the moving force

behind the constitutional violations in this case and directly and proximately caused Mr. Mazza to suffer the grievous and permanent injuries and damages set forth above.

Complaint, Docket No. 1, ¶¶ 61-66; *see also* ¶¶ 108-110.

These allegations are substantially similar to, and materially indistinguishable from, the allegations in the Complaint that the First Circuit found sufficient in *Haley v. City of Boston,* 657 F.3d 39, 52 (1st Cir. 2011):

> 49. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Boston in that Boston police officers regularly failed to disclose exculpatory evidence to criminal defendants, and otherwise violated due process in the manner alleged above. The above-described widespread practices, so well-settled as to constitute *de facto* policy in the Boston Police Department, were able to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.
>
> 50. Furthermore, the widespread practices described in the preceding paragraphs were permitted to flourish because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.

Complaint in *Haley v. City of Boston,* 1:09-cv-10197-RGS, previously filed with this Court as Exhibit A of Plaintiff's Opposition to Defendant City of Boston's Motion to Dismiss the Complaint (Docket No. 12). If anything, the allegations herein are more detailed than in *Haley*.

Accordingly, the Complaint herein does not rest solely on "[a]llegations of one's own injury, unmoored from a pattern of conduct by the municipality." Order, p. 13. Rather, the Complaint specifically alleges facts, which must be accepted as true at this stage of the proceedings, demonstrating that:

> [M]unicipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate

8

indifference to the unconstitutional effects of those inadequacies.

Order, p. 11, *quoting Haley,* 657 F.3d at 52.[6]

The Order improperly dismissed the failure to train allegations set out in plaintiff's Complaint, and must be reconsidered and reversed, preserving that portion of plaintiff's claims.

### II. THE ORDER'S DENIAL OF PLAINTIFF'S MOTION TO SERVE THE CITY AS INSURER OF THE DECEASED DEFENDANTS MUST BE RECONSIDERED AND REVERSED

"[A] contract must not, whenever possible, be construed so as to render any of its terms meaningless." *Baybank Middlesex v. 1200 Beacon Properties, Inc.,* 760 F. Supp. 957, 963 (D. Mass. 1991). The First Circuit affirmed this principle recently in *Axia Netmedia Corp. v. Mass. Tech. Park Corp.,* 889 F.3d 1 (1st Cir. 2018), where it rejected plaintiff's interpretation of a contract clause because under the plaintiff's interpretation, the clause "would do no work." *Id.,* at 9. The Order improperly renders the City's promise in the relevant collective bargaining agreements ("CBAs") meaningless, and must be reconsidered. *Id.*

The City is contractually bound to represent the deceased defendants in this case. Plaintiff contends that the CBAs constitute liability insurance or a liability bond pursuant to M.G.L. c. 190B, § 3-803(d)(2), making the City an appropriate

---

[6] *Haley*, cited to the Court in plaintiff's opposition to the Motion to Dismiss, involved a strikingly similar scenario to that set out in the Complaint herein during precisely the same time period, 1972-1973. *Haley*, 657 F.3d at 45.

9

recipient of service for the deceased individual defendants.  The CBAs each provide that:[7]

> The City <u>will</u> *represent* <u>and</u> *indemnify* bargaining unit members to the extent permitted by M.G.L. c. 258 § 9.  (emphasis added).

The contractual term that the City "will" represent the officers herein, and will indemnify them is directive language, that is it imposes requirements, not subject to discretion.  The only exceptions lie in the two limitations imposed by M.G.L. c. 258, § 9 ("Section 9"), set out below, one as to who is eligible and the second being the cap on recompense allowed.

Nonetheless, the Order states that this language "makes indemnification permissive, not mandatory, and permits the City to indemnify or not on a case-by-case basis."[8]  Order, p. 16.  However, since Section 9 already permits the City to indemnify on a case-by-case basis, the Order's interpretation renders the indemnification clause meaningless, and violates the strictures of contract interpretation.  *Baybank Middlesex,* 760 F. Supp. at 963; *Axia Netmedia Corp.,* 889 F.3d at 9.   It also violates the rule of Massachusetts law which says an insurance contract must be strictly construed in favor of the insured if there is any ambiguity.

---

[7] The officer defendants herein include both patrol officers and detectives, who are bound by different CBAs.  Copies of representative collective bargaining agreements binding the City were attached as Exhibit D (patrol officers) and Exhibit E (detectives) of the Motion to Serve the City (Docket No. 13).  The relevant provision is identically worded in each CBA.

[8] As noted, the issue before this Court is not whether Plaintiff can enforce the indemnification clause against the City, but whether the City is contractually bound to indemnify the defendants, such that it is a proper recipient of service pursuant to M.G.L. c. 190B, § 3-803(d)(2).

*Siebe, Inc. v. Louis M. Gerson Co., Inc.*, 74 Mass. App. Ct. 544, 554 (2009).  The City is a self-insurer.[9]  Section 9 permits the City to exercise its discretion to commit to indemnify police officers within the parameters of the statute, which it did in the CBAs, as properly interpreted.  Furthermore, the City's contractual obligation to *represent* the individual defendants is not related to Section 9, which makes no reference to representation, and that obligation is clearly mandatory.

   A proper interpretation of the CBAs, which does not render them meaningless, *Baybank Middlesex,* 760 F. Supp. at 963; *Axia Netmedia Corp.*, 889 F.3d at 9, recognizes that, while Section 9 grants the City discretion to decide whether to indemnify its employees, it says nothing about at what point that discretion may be exercised, and the City has made that determination via the CBA contracts.  The City was fully within its statutory authority to exercise its discretion during the negotiation and signing of the CBAs, and did so, agreeing without caveat both to "represent" the officers and to "indemnify" the officers to the extent permitted by Section 9.  The parameters of Section 9 limit the City's ability under the CBAs to represent and indemnify in two ways:

---

[9] *See* Comprehensive Annual Financial Report, Fiscal Year Ended June 30, 2013, p. 78, entered as Document 71-1 in *Weichel v. City of Boston*, 20-cv-11456-IT, attached hereto as Exhibit 1 ("The Risk Management Program focuses on a planned strategy of self-insurance, supported by strong prevention and cost reduction efforts, financial reserves and catastrophic insurance. *The City is self-insured in most areas of risk including general liability,. . ..*") (emphasis added).

>  1)  The indemnification cannot exceed one million dollars,[10] and
>
>  2)  the wrongful act at issue must have been taken by the employee "within the scope of his official duties or employment."

Under each CBA, the City is bound to represent and indemnify an employee unless one of those limitations is in play.[11] Although the Order states it cannot "read into the CBA a more extensive indemnification than the parties bargained for," in fact, the Order reads *out* of the CBA the representation and indemnification agreed to, leaving the indemnification clause superfluous, that is, meaningless, contrary to law. *Baybank Middlesex,* 760 F.Supp. at 963; *Axia Netmedia Corp.,* 889 F.3d at 9.

Furthermore, the Order's reliance, at pp. 16-17, on *Williams v. City of Brockton*, 2013 WL 254778 and *City of Boston v. Boston Police Patrolmen's Association, Inc.*, 48 Mass. App. Ct. 74 (1999), in support of its interpretation of the CBAs is misplaced. In *Williams*, the contractual language being interpreted stated "[t]he policy for indemnification of officers for acts within the scope of employment shall be as per M.G.L. c. 258, § 9." *Williams v. City of Brockton*, 2013 WL 254778 at *8, emendation by the court. That language merely highlights that the Town's discretionary policy conforms to the statutory provisions, but crucially does not agree to either represent or indemnify employees using the mandatory "will represent and indemnify" clauses included in the CBAs at issue herein. In *City of*

---

[10] The City recognizes that "The City's legal liabilities are capped per M.G.L. Chapter 258, and Corporation Counsel defends the City in any lawsuits that arise from the normal course of operations." Exhibit 1, p. 78.

[11] The City has made no claim that either exception applies herein.

*Boston*, the issue was whether an arbitrator could order the City to enter a contract with a mandatory indemnification provision, as opposed to the situation herein, whether such a contract, entered into voluntarily by the City, had meaning and was binding.

Neither the City nor the Order cite anything to support the proposition that M.G.L. c. 190B, § 3-803(d)(2), which provides for service of process on the liability insurer, allows the insurer to refuse service because its representation and indemnification obligation arises through a contract rather than a statute. Indeed, chapter 190B specifically refers to "liability insurance," which is typically a contractual, not statutory, obligation.[12] *Siebe, Inc.*, 74 Mass. App. Ct. at 554 (noting that insurance policies are contracts). An obligation is binding whether it is sourced in a contract or a statute. Another session of this Court has determined that M.G.L. c. 190B, § 3-803(d)(2) does not require a court order, but is self-enforcing, *Weichel v. Town of Braintree, et al.*,[13] 1:20-cv-11456-IT, Doc. No. 86, and that service on the City of Boston properly brings a deceased individual Boston police officer before the court. *See id.*, Memorandum and Order dated February 18, 2022, Doc. No. 129, p. 2, attached hereto as Exhibit 2; *id.*, Notice of Electronic filing, dated May 13, 2021, Doc. No. 86, attached hereto as Exhibit 3.

Plaintiff's interpretation of the CBAs also accords with the City's interpretation reflected in its actual practice of indemnification. The City paid 23

---

[12] *See* Docket No. 13, incorporated herein by reference.

[13] The other defendants in that case included a police officer working for the City of Boston.

13

judgments or settlements between 2018 and November 11, 2023, pursuant to the CBA.  *See* Declaration of James Megee, attached hereto as Exhibit 4.[14]  The only instance in that time period for which the City failed to indemnify an officer was when Officer Kevin Smith was terminated for reasons related to the alleged wrongdoing, that is, when he was acting outside the scope of his employment, and therefore subject to a Section 9 limitation.  Exhibit 4.  Although the declaration states there are no policies or criteria by which the City decides who to indemnify, the evidence of indemnification belies that claim.  Rather, it is clear the City understands and abides by its obligation pursuant to the CBAs to represent and to indemnify its officers acting within the scope of their employment, consistent with the interpretation of its obligations set out herein.

Finally, since the City's contractual obligation to "represent" the individual defendants is not provided for in Section 9, it clearly means that the limitation of the benefit provided by the parameters of Section 9 is only with regard to indemnification, which is referenced in in the statute, further confirming that the "will" language in the CBAs is intended to be mandatory.  The reference to limiting the indemnification to the parameters of Section 9 is limned by the wording it bears on, the one million dollar cap on indemnification, as well as the requirement that the act at issue have been within the scope of employment.  This reading is corroborated by the City's history of not representing someone whose conduct was outside the scope of employment, and indemnifying all others.  Exhibit 4.

---

[14] The Declaration was submitted to this Court in *Weichel*, Document 237-3.

### III.   REPORTING TO THE FIRST CIRCUIT

If this Court determines to deny Plaintiff's requests set out herein, he prays this Court to report the issues to the First Circuit.  To report a matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the Court must find that the Order:

> "(1) 'involv[ed] a controlling question of law,'
>
> (2) 'as to which there is substantial ground for difference of opinion,' and
>
> (3) for which 'an immediate appeal from the order may materially advance the ultimate termination of the litigation.'..."

*Caraballo-Seda v. Municipality of Hormigueros*, 395 F.3d 7, 9 (1st Cir. 2005), *quoting* 28 U.S.C. § 1292(b).  Each of these criteria is clearly met with regard to both the service issue and the training issue addressed in this motion.

### A.   SERVING THE CITY ON BEHALF OF THE DECEASED POLICE OFFICERS

1) Whether the City can be served in the place of the deceased defendants, is a controlling questions of law, as the Order's determination of the inability to serve the deceased defendants effectively terminates the litigation against the police officers.

2) As the Order notes, another session of this Court has determined in a substantially similar case, *Rosario v. Waterhouse*, No. 1:19-cv-10532-LTS, 2019 WL 17852109, at *1-2, *4, contrary to the ruling of this court, that the indemnification of police officers qualifies as a liability bond allowing service on the city at issue therein, indicating that there is a substantial ground for difference of opinion.  Further, as noted *supra*, in *Weichel,* another session of

this Court also determined contrary to this court's ruling that the City of Boston, specifically, can be served pursuant to M.G.L. c. 190B, § 3-803(d)(2) to bring a deceased police officer defendant before the Court.  Exhibit 3; [15] *compare Caraballo-Seda*, 395 F.3d at 9 (where two other district courts in Puerto Rico had reached the same conclusion, there was not substantial ground for difference of opinion).

3) Finally, an immediate appeal may materially advance the ultimate termination of the litigation.  Success on an interlocutory appeal would result in trying all defendants in a single trial, where waiting until the end of the trial of the City to resolve the issue of whether the individual defendants can be served would necessitate two trials.

    B.    **THE LACK OF TRAINING ISSUE**

It is also clear that the training issue should also be reported to the First Circuit:

1) Whether the Complaint adequately sets out a claim as to the City's failure to adequately train its police officers is a controlling question of law, and the Order's determination of the improper training *Monell* claim effectively terminates the litigation as to an important constitutionally-based claim;

2) As noted above, the First Circuit recognizes the sufficiency of the pleadings herein, indicating that there is a substantial ground for difference of opinion.

---

[15] *See* Exhibit 3 ("Plaintiff shall serve process on the entity providing the policy of liability bond or liability insurance from which Plaintiff intends to satisfy any judgment against the decedent.").  The City of Boston was served on behalf of deceased officer Walter Derby.  Exhibit 2, p. 2.

3) Again, an immediate appeal may materially advance the ultimate termination of the litigation.  Success on an interlocutory appeal would result in trying all claims in a single trial, where waiting until the end of the trial of the City to resolve the issue of whether the training claim can be pursued would necessitate two trials.

Where all three of the criteria are met as to each issue, and each issue is both discrete and conclusive for the defendants or claim it effects, the circumstances cry out for an interlocutory appeal.  Plaintiff also notes that he is 75 years old.  Delay reaching the merits as to all defendants is not only inconsistent with judicial economy, it is contrary to the ends of justice.

## IV.   CONCLUSION

For all the foregoing reasons, the Order must be reconsidered and reversed. Mr. Mazza should be allowed to continue his failure to train claim against the City, and the City should be directed to accept service for the individual defendants.

ANTHONY MAZZA,
By his attorneys

/s/ *John H. Cunha*

John H. Cunha, Jr.
cunha@cunhaholcomb.com
BBO No. 108580
Helen Holcomb
holcomb@cunhaholcomb.com
B.B.O. No. 547538
CUNHA & HOLCOMB, P.C.
I State Street, Suite 500
Boston, MA 02109-3507
(617) 523-4300

**CERTIFICATE OF SERVICE**

I hereby certify that on this date this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

_/s/ John H. Cunha_
John H. Cunha, Jr.

**CERTIFICATE OF LOCAL RULE 7.1 COMPLIANCE**

I hereby certify that on Monday February 3, 2025, this motion was discussed with counsel for the City, and they indicated that they will be filing an opposition. They may join in the request to have the service issue reported to the First Circuit, and will state their position on that matter in the filed opposition.

_/s/ John H. Cunha_
John H. Cunha, Jr.

Dated: February 5, 2025